## UNITED STATES v. MICHIGAN CENT. R. Co. et al.[1]

*(District Court, N. D. Illinois. June 23, 1890.)*

1. CARRIERS—INTERSTATE COMMERCE—REBATES.

Where a railroad company which has fixed a rate of 20 cents per hundred for freight from Chicago to New York, and 22 cents per hundred for freight from points west of Chicago to New York, of which latter rate said company receives 18 cents, makes an arrangement with a Chicago firm to ship its freight from Chicago to New York at 22 cents under bills of lading purporting to come from western points, and to return to them 4 cents under pretense of paying it to the road bringing the freight into Chicago, it is guilty of a violation of the provision of the interstate commerce act of February 4, 1887, which makes it a misdemeanor for a common carrier to charge different rates from those fixed in its schedule.

2. SAME—CRIMINAL LIABILITY OF OFFICERS.

Where such arrangement was made by the assistant general freight agent, the fact that the local freight agent, and the agent who made out the bills of lading, knew that there was something unusual and out of the ordinary course of business in such shipments, is not sufficient notice to them that the company was violating said act to make them criminally liable therefor.

At Law.

*W. G. Ewing*, U. S. Dist. Atty., for plaintiff.

*Edwin Walker* and *Mills & Ingham*, for defendants.

BLODGETT, J. This is a criminal proceeding instituted under certain provisions of the interstate commerce act of February 4, 1887, and, the the offense charged being only a misdemeanor, a jury was waived, and the case tried by the court. The indictment contains six counts, charging, in substance, that the Michigan Central Railroad Company was in September, 1888, and for three months succeeding, a common carrier of passengers and property, owning and operating a railroad from Chicago, in the state of Illinois, eastward to Detroit, in the state of Michigan, and from thence having connections, by means of other railroads, with New York city, and other cities on the Atlantic coast. The said Michigan Central Railroad Company had fixed and published a schedule of rates for the transportation of passengers and property over its road, and also a schedule of rates for the transportation of passengers and property by way of its railroad and its connection with other carriers to New York city, in the state of New York, and that by such schedule of rates the rate for the transportation of grain from the city of Chicago to the city of New York was fixed at 20 cents per hundred pounds,—copies of which schedules had been filed with the interstate commerce commission,—whereby it became unlawful for said company to charge, demand, collect, or receive a greater or less compensation for the transportation of passengers or property, or for any service in connection therewith, than was specified in such published schedule of rates. But that, in violation of their duty and the law in that regard the defendants, the Michigan Central Railroad Company and Alexander Mackey, Fred. C. Nicholas, Matson P. Griswold, Arthur W. Street, and E. L. Somers, who were

---

[1] Reported by Louis Boisot, Jr., of the Chicago bar.

respectively the agents and persons acting for and employed by said Michigan Central Railroad Company, did unlawfully and willfully transport and cause to be transported, and willfully did suffer and permit to be transported, by said Michigan Central Railroad Company from the said city of Chicago to the said city of New York large quantities of oats and corn, the same being the property of the firm of Charles Counselman & Co., of Chicago, and did willfully and unlawfully receive and collect therefor a rate which was less than the rate and price fixed by said schedule of rates; that is to say, for the sum of 18.2 cents per hundred pounds, when the schedule rate was 20 cents per hundred pounds, which was a lower rate than was charged and received by said company to and from other persons for the transportation of like grain from Chicago to New York city, and contrary to the form of statute in such case made and provided.

The clauses of the interstate commerce act as it was passed, and as it stood at the time the acts complained of were committed, which are material for the purposes of this case, read as follows:

"Sec. 6. That every common carrier subject to the provisions of this act shall print and keep for public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established, and which are in force at the time upon its railroad, as defined by the first section of this act. * * * Every common carrier, subject to the provisions of this act, shall file with the commission hereinafter provided for copies of its schedules of rates, fares, and charges, which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes made in the same. Every such common carrier shall also file with said commission copies of all contracts, agreements, or arrangements with other common carriers in relation to any traffic affected by the provisions of this act to which it may be a party. And in cases where passengers and freight pass over continuous lines or routes operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs of rates or fares or charges for such continuous lines or routes, copies of such joint tariffs shall also, in like manner, be filed with said commission. * * * And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

"Sec. 10. That any common carrier, subject to the provisions of this act, or, whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, who, alone or with any other corporation, company, person, or party, shall willfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter, or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, * * * shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not to exceed $5,000 for each offense."

The indictment, as found, was against the Michigan Central Railroad Company, Alexander Mackey, George C. Nicholas, Matson P. Griswold,

Arthur W. Street, and E. L. Somers. The railroad company has never appeared, or been so served as to compel an appearance. On a motion for the issue of a distress warrant to compel an appearance, which was considered as a motion to quash the indictment as to the railroad company, this court held that a railroad corporation was not subject to be indicted under this act, and therefore the motion for the distress warrant asked for in the premises was overruled. Griswold pleaded a misnomer, which plea was confessed by the district attorney, and the case abated as to him; and a finding of "not guilty" was entered as to Mackey, at the conclusion of the proofs on the part of the government, on the ground that the proofs were not sufficient to and did not connect him with the offense charged; leaving the case to be yet disposed of on the evidence as to the defendants Street, Nicholas, and Somers.

There is little dispute as to the facts in the case. It is admitted that, at the time of the transaction complained of, Street was the assistant general freight agent of the Michigan Central Railroad Company, having his head-quarters in the city of Chicago; that Nicholas was the local freight agent of said company at Chicago; that Somers was the Chicago agent of the Blue Line, so far as said line was operated in connection with the Michigan Central Railroad; that in the latter part of September, 1888, the Michigan Central Railroad Company had fixed its schedule of rates under the provisions of the law, by which schedule the rate for the transportation of corn and oats from Chicago to New York by the line of said company and connecting lines was 20 cents per hundred pounds; that there was also a schedule rate for the transportation of such grain from points west and north, south and south-west, of Chicago, within certain limits, through Chicago to New York city, of 22 cents per hundred pounds,— that is, grain shipped at points west, south, south-west, and north-west of Chicago, within those limits, was carried directly through to New York at 22 cents per hundred pounds, of which the carrier which brought the grain to Chicago received its *pro rata*, and the carriers forming the through line from Chicago east to New York, respectively, received their *pro rata;* that not all the carriers reaching Chicago from the north-west, west, south, and south-west prorated on this 22-cent rate, the Illinois Central Railroad Company being one of the companies that did not so prorate; and that grain arriving in Chicago from points within the limits I have referred to, by roads that did not prorate, was charged at the rate of 25 cents per hundred pounds for transportation to New York city from those points outside of Chicago. The proof also shows that in September, 1888, Street, as assistant general freight agent of the Michigan Central Railroad Company, made an agreement with the firm of Charles Counselman & Co. by which grain which Counselman & Co. should have in their elevators, or in cars on the railroad tracks in the city of Chicago, should go forward at the *pro rata* to which the Michigan Central and its eastern connections would be entitled, at the 22-cent rate on grain shipped from points within the 22-cent limit; that is, for illustration, grain arriving in Chicago by the Chicago, Rock Island & Pacific Railroad would arrive here subject to the *pro rata* of the 22-cent rate to which the Chicago, Rock Island & Pacific Railroad Company would be entitled. This *pro rata* the

Michigan Central Railroad Company assumed, and paid the Rock Island Railroad on what was known in the business as "expense bills," and the *pro rata* of the roads thus bringing the grain to Chicago left 18.2 cents per hundred pounds as the rate to be paid the Michigan Central Railroad Company and its connecting lines east for transporting the grain from Chicago to New York. In other words, Counselman & Co., by this scheme, got their grain shipped from Chicago to New York city for 18.2 cents per hundred pounds, while other shippers were charged 20 cents per hundred pounds for transportation of the same kinds of grain.

The scheme was carried out by resorting to fictitious "expense bills," which, while they purported to come from other railroads, such as the Chicago & Northwestern Railroad Company, the Chicago, Burlington & Quincy Railroad Company, etc., and to represent actual grain which had arrived in Chicago from points on the lines of those roads within the 22-cent rate limit, for direct shipment through to New York, were, in fact, made out at the office of Counselman & Co., in this city, and were paid by the Michigan Central Railroad Company to Counselman & Co., instead of being paid to roads which had brought the grain to Chicago. The grain, thus shipped, went forward as subject to the 20-cent rate from Chicago to New York city; and these "expense bills," so paid to Counselman & Co., operated, in effect, as a drawback to them, which reduced the actual cost of transporting their grain from Chicago to New York city to 18.2 cents per hundred pounds. And the proof also shows that certain car-loads of grain which had arrived in the city of Chicago by the Illinois Central Railroad, which did not prorate with the other companies on the 22-cent rate, were also sent forward under this arrangement at the *pro rata* of the Michigan Central Railroad of 18.2 cents per hundred pounds. The proof also shows that this scheme had its inception in the latter part of September, and was carried on during the succeeding months of October and November, within which time a large number of car-loads of corn and oats were shipped by Counselman & Co. to New York city, and other eastern cities, at the rate mentioned; thus giving Counselman & Co. an advantage as against other shippers of one cent and eight-tenths on each hundred pounds of grain so shipped for them. The testimony brings the case so clearly within the prohibitory provisions of the interstate commerce act which I have quoted, as to the defendant Street, that no defense was interposed in his behalf.

This leaves the proof only to be considered as to the defendants Nicholas and Somers. Nicholas was the local freight agent of the Michigan Central Railroad, and all these shipments passed through his office, the way-bills were made at his office, and these fictitious "expense bills" paid from his office by checks to Counselman & Co. Somers, as agent of the Blue Line, seems from the proof to have done nothing except to make out the bills of lading which were delivered to the shippers. This being a criminal offense, the proofs must be clear, and leave no room for reasonable doubt of the defendants' guilt. The main inculpating proof against Nicholas is that one of his clerks noticed that there was something unusual about these "expense bills," and called Nicholas' at-

tention to them. Nicholas referred him to Street as his superior officer, and, on the clerk's presenting the matter to Street, he was told, "They are all right." This was communicated by the clerk to Nicholas, when Nicholas replied: "Well, if Mr. Street says they are all right, of course they must be so." The bills of lading made out by Somers for shipments over the Blue Line contain matter which might well have put him on inquiry, and which, were this a civil action, might be held enough to charge him with notice that the shipments were irregular, and out of the usual course of business. But in a criminal case, as this is, the proofs must be much more conclusive and convincing in order to justify a finding of guilty. And the same may be said in regard to Nicholas. He undoubtedly knew that there was something unusual, and out of the ordinary course of business, in this shipment, but I do not think that the proof in this case brings home to either of these two defendants knowledge that the Michigan Central Railroad Company was shipping this grain for Counselman & Co. for less than the tariff rates, which it must do, to justify a finding of guilty. The law intended to punish only an active and willful violator of its provisions. Men who occupy a merely clerical position, who are only the instruments which carry out an unlawful scheme or contract made by their superior officers, which they do not concoct, should not be punished, except where the proof of guilty knowledge and participation is clear. If the agents or employes of a railroad of whatever rank make an unlawful contract, or if they knowingly aid and abet in the execution of an unlawful contract, which is made an offense under the interstate commerce act, they undoubtedly subject themselves to the penalties, but the proof, as in all criminal cases, should be clear, and leave no reasonable ground for doubt as to their guilt, and of their knowledge that they were engaged in consummating an illegal contract. . This is particularly true in cases which may arise under the law now under consideration, from the fact that these large common-carrier-corporations are dominated, and their business arrangements substantially made, by the officers who are heads of departments, either in regard to freights or passengers, and the work of their subordinates is almost wholly clerical; that is, they are bound to do whatever their superior officers, require of them. It may be said, I think, that, as a rule, men in such positions have only the alternative to either obey orders or resign; and while it is no excuse for a railroad employe who has willingly and knowingly aided and abetted in the violation of the law that he did it under the instructions of his superior officer, yet it seems to me it furnishes a cogent reason why such persons should only be convicted where the proof of their guilt is clear and beyond doubt. There will be a finding of guilty as to the defendant Street, and not guilty as to the defendants Nicholas and Somers. The indictment will also be quashed as to the defendant the Michigan Central Railroad Company, as it was understood at the time the motion for a distress warrant was argued that such motion should have the effect of a motion to quash on behalf of the company.